UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

MERCURY PARTNERS LLC, :

Plaintiffs, :

-against- :

PACIFIC MEDICAL BUILDINGS, L.P., :

Defendant. :

-----------------------------------X

02 Civ. 6005 (HBP)

OPINION AND ORDER

PITMAN, United States Magistrate Judge:

I. Introduction

This is an action for breach of contract, arising out of a written agreement ("Agreement") between Mercury Partners LLC ("Mercury" or "plaintiff") and Pacific Medical Buildings, L.P. ("Pacific" or "defendant"), under which Mercury was to act as Pacific's sole and exclusive financial advisor to evaluate various capitalization strategies. Mercury seeks fees allegedly due under the Agreement, interest, attorney's fees and costs, and a declaration that Pacific is obligated to pay additional advisory fees for certain transactions. Pacific contends that Mercury is not entitled to any further fees beyond those already paid.

In April 2006 the parties stipulated to try separately the issues of liability and damages.

The parties consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c), and the matter was tried before me, without a jury, on January 16 and 17, 2007. Based on the testimony and other evidence offered at trial and the parties' post-trial submissions, I make the following findings of fact and conclusions of law.

## II. Findings of Fact

### A. Background

1. Plaintiff Mercury Partners describes itself as a "real estate investment bank" that provided financial advisory services to various entities in the real estate and health care industries. (Direct Testimony Affidavit of Malcolm F. MacLean IV, sworn to January 8, 2007 ("MacLean Aff.") ¶ 4). Mercury is a Maryland limited liability company with its principal place of business in Greenwich, Connecticut (Joint Pre-Trial Statement, dated April 27, 2006). Malcolm F. MacLean IV is a Managing Director of Mercury (Stipulated Facts[1] ¶ 1).

---

[1]"Stipulated Facts" refers to the parties' joint statement of undisputed facts, set forth in the Joint Pre-Trial Statement, at Page 4. "Tr." refers to the trial transcript. "Dep.," preceded by a name, refers to the transcript of the deposition of the witness identified in the citation. The parties have marked the deposition transcripts as exhibits and the parenthetical after "Dep." refers to the exhibit number of the deposition transcript. Finally, "PX" and "DX" refer to plaintiffs' exhibits and defendant's exhibits, respectively.

2. Pacific is a real estate development company that develops and manages medical office buildings primarily in the Western United States (DX A; Deposition of Elizabeth Powell ("Powell Dep.") (PX 97) at 23; Deposition of Jeffrey Rush, M.D., taken on April 18, 2003 ("Rush Dep.") (PX 94) at 20; Direct Testimony Affidavit of Jeffrey Rush, M.D., sworn to January 3, 2007 ("Rush Aff.") ¶¶ 2-4; Deposition of Mark Toothacre ("Toothacre Dep.") (PX 95) at 179; Direct Testimony Affidavit of Mark Toothacre, sworn to January 3, 2007 ("Toothacre Aff.") ¶¶ 2-4). Pacific is headquartered in San Diego, California (Rush Aff. ¶ 2; Toothacre Aff. ¶ 2). Jeffrey Rush is Chairman of Pacific (Stipulated Facts ¶ 2). Mark Toothacre is Executive Vice President of Pacific Medical (Stipulated Facts ¶ 3). Elizabeth Powell is Chief Financial Officer and Vice President of Operations of Pacific (Stipulated Facts ¶ 4). Robert Rosenthal is President of Pacific (Direct Testimony Affidavit of Robert Rosenthal, sworn to January 2, 2007 ("Rosenthal Aff.") ¶ 1).

3. Pacific locates property adjacent or close to hospitals and, with the cooperation of the hospitals, subsequently arranges financing for and develops, builds, and operates office buildings, parking spaces and outpatient facilities to be used primarily by physicians who practice in the nearby hospitals (DX A; Rush Aff. ¶¶ 3-4; Rush Dep. (PX 94) at 20-21; Toothacre Aff. ¶¶ 3-4; Toothacre Dep. (PX 95) at 15, 191-

92; Tr. at 100-101; 109-110). Pacific finances each of its projects on an individual, project-by-project basis (Rush Aff. ¶¶ 3-4; Toothacre Aff. ¶ 3; Toothacre Dep. (PX 95) at 191-92; Tr. at 100-01; 109-10). Pacific's principals and an established group of investors provide capital for its property development projects (DX-A at MP151-52; Powell Dep. (PX 97) at 12; Rush Aff. ¶¶ 5, 26; Rush Dep. (PX 94) at 24-26; Toothacre Aff. ¶¶ 5, 34; Tr. at 109; Toothacre Dep. (PX 95) at 27-28, 178-80, 202, 204). Dr. Rush has been the principal investor, providing up to approximately one-half of the capital for Pacific's projects (Rush Aff. ¶ 5; Rush Dep. (PX 94) at 24-26; Toothacre Dep. (PX 95) at 27-28, 202, 204).

B. The Origin and <u>Drafting of the Agreement</u>

4. Dr. Rush and Mr. MacLean first met in April 2001 on an airplane (Stipulated Facts ¶ 5). They discussed Pacific's business and the prospect of Mercury providing financial advisory services to assist Pacific in securing investment capital (MacLean Aff. ¶¶ 6-7; Powell Dep. (PX 97) at 12; Rush Aff. ¶¶ 6-9; Rush Dep. (PX 94) at 50-51, 140-41, 160; Toothacre Aff. ¶ 7; Toothacre Dep. (PX 95) at 46-47, 204).

5. In late April or early May 2001, Rush and MacLean orally agreed that Mercury would become Pacific's financial advisor (MacLean Aff. ¶ 12).

6. MacLean drafted a proposed engagement letter, dated May 11, 2001 (MacLean Aff. ¶ 21; PX 75). MacLean claims to have sent this letter to Rush on or about May 11, 2001 (MacLean Aff. ¶ 21).

7. The May 11, 2001 draft agreement differs from the Agreement ultimately signed by the parties in the following material respects: (1) Paragraph 1 of the May 11 draft contained a provision not present in the final Agreement that Mercury will "assist[] in general business and financial analysis of [Pacific], including transaction feasibility analyses and valuation analyses;" (2) Paragraph 2 of the May 11 draft provided for a $50,000, rather than $35,000, retention fee; (3) Paragraph 2 of the May 11 draft did not contain any provisions pertaining to mortgages or property related financing, and (4) Paragraph 9 provided that the term of the engagement would be 36 months (PX 57; PX 75).

8. At some unspecified point in time MacLean crossed-out the $50,000 retention fee figure in Paragraph 2 of the May 11, 2001 draft and handwrote next to it the number "35,000," followed by a question mark (MacLean Aff. ¶ 37; PX 75). Similarly, MacLean crossed-out the 36 month post-termination period during which Mercury would still be owed advisory fees in Paragraph 9, and handwrote next to it the number "24" at an unspecified date.

9. MacLean sent a letter to Pacific dated May 31, 2001 stating in pertinent part that he was "excited to be working with you and your organization as your financial advisor in structuring and negotiating a capital transaction for Pacific[.] I am confident that a transaction can be consummated on favorable terms to you whereby you will receive the capital to incrementally grow your company. . . . I . . . look forward to continuing to work diligently to finalize a transaction." (MacLean Aff. ¶ 58; PX 86). Mercury claims that it had begun working for Pacific at the time of the May 11, 2001 letter, although no contract had been signed as of that date (MacLean Aff. ¶ 59; PX 29 at MP 00318; Tr. at 144).

10. MacLean attached a revised draft engagement agreement, dated May 24, 2001, to his May 31, 2001 letter (MacLean Aff. ¶ 58; PX 86). The May 24, 2001 draft engagement agreement was identical in all respects to the original May 11, 2001 draft except that the provisions in Paragraph 9 concerning the term of the engagement and duration of the post-termination period during which Mercury would be owed advisory fees were both reduced to 24 months (MacLean Aff. ¶ 64; PX 86).

11. There is a handwritten comment on the May 24, 2001 draft engagement letter crossing-out the $50,000 retainer fee in Paragraph 2 and stating "$25,000 when Rothschild's closes"

(MacLean Aff. ¶ 65; PX 86). Mark Toothacre testified that he may have made this alteration (Tr. at 120).

12. On September 28, 2001, MacLean sent a second revised draft of the engagement agreement to Pacific with a cover letter of the same date (MacLean Aff ¶ 67; PX 82). The cover letter stated that the attached draft reflected changes that the parties had "discussed in San Diego" (PX 82). The letter stated in pertinent part that the second revised draft engagement letter "clarified the fee structure for mortgage debt versus senior, subordinated or mezzanine debt" and that, "[a]s discussed, [it] reduced the fee payable on mortgage debt from 2% to 1%" (PX 82).

13. The September 28, 2001 draft engagement agreement differed from the previous, May 24, 2001 draft in the following material respects: (1) the September 28 draft omitted from Paragraph 1 the language that Mercury will "assist [Pacific] in general business and financial analysis of [Pacific], including transaction feasibility analyses and valuation analyses"; (2) the September 28 draft reduced the retention fee in Paragraph 2 to $35,000; (3) Paragraph 2 of the September 28 draft was modified to provide that financial advisory fees were now to be paid "at closing of each transaction;" (4) Paragraph 2(a) of the September 28 draft contained an additional provision under which Pacific was to "issue to Mercury Partners a warrant to purchase 350,000 shares of common equity at a price of $10.00 per share at closing

of" any equity transactions; (5) Paragraph 2(c) of the September 28 draft contained a new provision stating that "[i]n connection with any issuance of mortgage or property-related financing, [Pacific] will pay a financial advisory fee equal to 1% of the gross proceeds of the Transaction(s)," and (6) Paragraph 9 of the September 28 draft provided that the duration of the post-termination period during which Mercury would be owed advisory fees would be 36 months (PX 82).

14. Pacific did not sign the September 28, 2001 draft engagement letter as presented, but rather, made several alterations before signing it. Further, Pacific deferred signing the Agreement until December 2001 or January 2002. Pacific contends that it deferred signing the Agreement until Mercury could produce a satisfactory transaction which the parties could address in whatever engagement letter they signed (Rush Aff. ¶ 17; Toothacre Aff. ¶ 24; Toothacre Dep. at 96, 97; Tr. at 195). Dr. Rush testified at trial, however, that he did not intentionally delay signing the Agreement (Rush Dep. at 117; Tr. at 194-95).

15. The Agreement ultimately entered into provided, in pertinent part, that Mercury was to "act as sole and exclusive financial advisor to Pacific Medical Buildings, L.P., its affiliates and successors to evaluate various capitalization strategies" (PX 57 Introductory ¶). The Agreement further

provided that the capitalization strategies may include the issuance of equity, debt and mezzanine capital, the merger with or sale to another company or an initial public offering of equity securities (hereinafter the "Transactions") (PX 57 Introductory ¶). Mercury was to assist Pacific "in analyzing, structuring, negotiating, effecting the Transaction(s)" (PX 57 ¶ 1).

16. In return, Pacific was to pay Mercury a retention fee of $35,000, and pursuant to Paragraph 2 of the Agreement, a financial advisory fee at the closing of each of the following types of Transactions: "(a) . . . any placement of private or public equity, equity related, or convertible securities . . . (b) . . . any issuance of senior, subordinated or mezzanine debt . . . (c) . . . any issuance of mortgage or property-related financing . . . (d) . . . any merger, acquisition, or sale transaction . . . (e) . . . an initial public offering" (PX 57 ¶ 2).

17. Handwritten after the text in subparagraph 2(c) of the Agreement was the sentence: "This assumes that Mercury originates the financing" (PX 57 ¶ 2). Handwritten after the text in subparagraph 2(d) was the sentence: "This assumes that Mercury originates/participates in the transaction" (PX 57 ¶ 2). Both of these amendments were made by Dr. Rush (Tr. at 208-09).

18. The term of the engagement under the Agreement was 24 months from the date of the Agreement unless terminated in accordance with the terms of the Agreement (PX 57 ¶ 9). The Agreement permitted either party to terminate the Agreement at any time by providing the other party with at least thirty days' prior written notice (PX 57 ¶ 9).

19. The Agreement also provided that fees payable to Mercury were to survive any termination of the Agreement and were payable on "any Transaction that [was] completed within 36 months of the expiration or termination of th[e] Agreement" (PX 57 ¶ 9).

20. The Agreement further provided that Pacific will "reimburse Mercury . . . for its reasonable expenses, including the fees and disbursements of its legal counsel, incurred in connection with this engagement" (PX 57 ¶ 2).

C. Sophistication and Attentiveness of The Parties

21. Dr. Rush and Mr. Toothacre negotiated the Agreement on behalf of Pacific Medical (MacLean Aff. ¶ 49; Tr. at 101, 181).

22. Mr. MacLean negotiated the Agreement on behalf of Mercury Partners (MacLean Aff. ¶¶ 7, 12).

23. Dr. Rush, Mr. Toothacre, and Mr. MacLean were all sophisticated business-people with extensive experience

negotiating contracts (MacLean Aff. ¶¶ 2-5, 8, 13, 72; Tr. at 99-100).

24. Robert Rosenthal played a "very limited" role in the negotiation of the Agreement, and his contact with Mercury was "minimal" during the engagement (Tr. at 157-58, 229).

25. Elizabeth Powell played no role in reviewing or negotiating the Agreement and had no firsthand knowledge of anything that was said by either party to the other during those negotiations (Tr. 156-57).

26. Pacific had an in-house attorney, Evan Stone, Esq., during the period the Agreement was being negotiated. However, Dr. Rush did not consult with Mr. Stone during the negotiation of the Agreement or at any time thereafter (Tr. at 180, 268-69). Similarly, Mr. Toothacre was aware that Pacific had in-house counsel, but he, too, never had Mr. Stone review the Agreement (Tr. at 103).

27. Neither Mr. Toothacre nor Dr. Rush consulted, nor, so far as either is aware, did any one else at Pacific consult, Pacific's regular outside counsel, Seltzer & Caplan, or any other attorney concerning the Agreement (Tr. at 103-04, 181).

28. Mercury had corporate counsel at the time the Agreement was negotiated and executed, but Mr. MacLean could not recall whether he consulted with counsel in connection with the Agreement (Tr. at 88).

29. Mr. Toothacre did not review the Agreement closely before approving it, as amended by Dr. Rush, and was not sure if he read the earlier drafts of the Agreement that Mercury sent to Pacific (Toothacre Dep. (PX 95) at 96-98; Tr. at 101, 119, 123).

30. Dr. Rush testified at his deposition that he "probably did not do as good a job as [he] should have done in some of the paragraphs" of the Agreement, that he "should have put some lineations in that relative to ¶ [2](a) to clarify it" and that he "probably should have" been "more thorough" and added the same proviso to ¶ 2(a) and ¶ 2(b) to "clarify" his intent as he did with ¶ 2(c) and ¶ 2(d) (Rush Dep. (PX 94) at 127, 132, 136-37, 163).

31. Similarly, Dr. Rush testified at trial that he "probably could have done a better job with some of the paragraphs" in the Agreement and that he could have "changed things" to negotiate "a better agreement for Pacific" (Tr. at 203). Dr. Rush "didn't focus" on the different schedules of fees Mercury would earn for different types of transactions (Trial Tr. at 258)). Dr. Rush also testified that he reviewed and edited the Agreement "rather rapidly" and "very quickly" (Tr. at 267-69).

D. Mercury's Performance Under The Agreement

32. Between May 2001 and May 2002, Mercury evaluated capitalization strategies for Pacific by assisting Pacific in analyzing, structuring and negotiating financing transactions (MacLean Aff. ¶¶ 105, 113, 130).

33. Specifically, Mercury evaluated various capitalization strategies involving several financing proposals made by a company called Lillibridge, in conjunction with a company called Prudential (MacLean Aff. ¶¶ 106-15, 141; PX 12; PX 14; PX 16; PX 29; Toothacre Aff. ¶ 15; Tr. at 79, 117-19, 191, 247-48).

34. Mercury also evaluated capitalization strategies involving a financing proposal made by a company called Rothschi-ld (MacLean Aff. ¶¶ 116-38; PX 1; PX 17; PX 18; PX 19; PX 20; PX 21; PX 25; PX 29; PX 32; PX 34; PX 35; PX 39; PX 42; PX 45; Rush Aff. ¶ 11; Toothacre Aff. ¶ 16; Tr. at 192).

35. Mercury also evaluated proposed capitalization strategies involving other financing partners as well, including companies such as Fidelity Real Estate, Warburg Pincus, and LaSalle (MacLean Aff. ¶¶ 139-40; Tr. at 145, 192).

36. Mercury did financial modeling and cash-flow projections, due diligence, project site visits, and participated in conference calls and meetings with potential financial

partners and their attorneys and accountants (MacLean Aff. ¶¶ 106, 117, 121, 130; Tr. at 144, 221).

37. Pacific admits that Mercury's performance under the Agreement was satisfactory (Trial Tr. at 221; Rush Dep (PX 94) at 58-60).

E. Pacific's Performance Under the Agreement

38. The Agreement provided that the $35,000 retention fee was due upon the execution of the Agreement, which occurred in late 2001 or early 2002 (MacLean Aff. ¶ 95; PX 57 ¶ 2; Tr. at 142, 214).

39. Starting on December 31, 2001, and throughout the first five months of 2002; Mercury billed Pacific for the retention fee, but Pacific failed to remit payment (MacLean Aff. ¶¶ 142-43; PX 51; PX 52; PX 54; PX 55; Tr. at 142-43, 214).

40. In late May 2002, Pacific tried to renegotiate the amount of the retention fee, although it admittedly had no basis under the Agreement for doing so (MacLean Aff. ¶¶ 151-52; PX 56 at MP 00001; Tr. at 143, 214-15).

41. Pacific ultimately paid Mercury the full retention fee in May 2002, but only after Mercury had threatened to sue for the fee (MacLean Aff. ¶¶ 153-58; PX 73 at MP 02315; PX 74 at MP 002316-17; Stipulation of Fact ¶ 9; Tr. at 143).

F. The Termination of the Agreement

42. Negotiations between Pacific and Rothschild terminated without any agreement on April 22, 2002 (DX T; DX U; DX A2; DX A3; Rosenthal Aff. ¶ 14; Toothacre Dep. (PX 95) at 155, 207; Rush Aff. ¶ 29; Rush Dep. (PX 94) at 141-42; Toothacre Aff. ¶ 39).

43. Pacific considered the Agreement with Mercury to have terminated at the time the proposed Rothschild transaction fell through, and claims to have orally notified Mercury of this position (Rush Aff., ¶ 30; Rush Dep. (PX 94) at 141-42; Toothacre Aff. ¶ 39; Toothacre Dep. (PX 95) at 91, 154-56, 207).

44. Mercury attempted to discuss reviving the Lillibridge financing proposal with Pacific after negotiations with Rothschild terminated, but ceased performing any services for Pacific as of April 2002 (DX-A11; MacLean Aff. ¶ 141; MacLean Dep. at 37; PX 16; Toothacre Aff. ¶ 40; Tr. at 93-94).

45. Pacific first provided written notice of the termination of the Agreement to Mercury on February 7, 2003 (DX-A2; DX-A3; MacLean Aff. ¶¶ 161-63; PX 50 at 2; PX 95, Rush Aff. ¶ 30; Rush Dep. (PX-94) at 140-41; Toothacre Aff. ¶ 40; Toothacre Dep. (PX 95) at 154-56, 207; Tr. at 171).

G. Pacific's Projects that Originated Independently of Mercury

46. Prior to the execution of the Agreement Pacific had three projects under development in various locations, called Hillsboro, Burbank, and Reno, for which it was securing or was about to secure financing in the amount of approximately $3.5 million, $2 million, and $1.2 million in equity, respectively (PX 6; PX 7; Toothacre Dep. (PX 95) at 23, 26-29; Tr. at 224-25). Mercury admittedly did not originate the financing for these or any other projects (Deposition of Malcolm F. MacLean IV, taken on April 2, 2003 ("MacLean Dep.") (DX A11) at 202).

H. Proceedings to Date

47. In its Amended Complaint, Mercury alleged that Pacific breached the Agreement by failing to reimburse Mercury for its reasonable expenses and pay Mercury financial advisory fees due under the Agreement, and that Pacific was unjustly enriched as a result of transactions brought by Mercury's efforts. The complaint sought a declaration that Pacific is obligated to pay financial advisory fees to Mercury owed under the Agreement in connection with certain transactions completed during the time period of the Agreement and thirty-six months following the termination of the Agreement, monetary damages for fees owed, and fees and disbursements of legal counsel which have

been incurred in connection with the Agreement (Amended Complaint at 4-9).

48. On January 5, 2006, The Honorable Deborah A. Batts, United States District Judge, to whom this matter was previously assigned, ruled that the Agreement is "ambiguous such that the intentions of the parties regarding when Plaintiff is entitled to financial advisory fees cannot be ascertained from the face of the contract, nor is it clear what type of transactions constitute 'property-related financing'". Mercury Partners, LLC v. Pacific Medical Buildings, L.P., 02 Civ. 6005 (DAB), 2006 WL 36823 at *4 (S.D.N.Y. Jan. 5, 2006).

49. On December 12 and 15, 2006, counsel for plaintiff and defendant, respectively, executed a letter, dated December 1, 2006, settling the expenses claims in this action (Declaration of Samuel E. Bonderoff, Esq., dated January 10, 2007, ¶ 3).

50. Mercury makes three primary arguments in its Pre-Trial Memorandum of Law: (1) the Agreement requires that Mercury be paid for any equity or debt transactions completed during the contractual period, regardless of whether it participated in arranging the financing for the transaction; (2) the Hillsboro, Burbank, and Reno transactions involved equity financing for which Mercury is owed a fee, and were not mortgage or property-related financings in which fees were conditioned upon origination of the financing, and (3) Pacific owes Mercury fees

for any transaction that closed prior to March 8, 2006 -- 36 months from the effective date of Pacific's written termination of the agreement.

51. Pacific argues in its Trial Memorandum that Mercury's services under the Agreement were limited to advising on and arranging a large, "roll-up" type transaction whereby Pacific would "roll-up" its existing projects (which were being operated as stand-alone entities) into a single holding company, take on an equity partner with substantial capital, and cease its historical practice of raising capital with separate financings on a project-by-project basis. Pacific asserts that Mercury is not entitled to fees on non- "roll-up" transactions unless it originated or performed services on such transactions.

## III. Conclusions of Law and Findings of Fact that are Dependent Upon the Applicable Principles of Law

### A. Jurisdiction

52. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332 based on the diversity of citizenship of the parties. Mercury is a Maryland limited liability company with its principal place of business in Greenwhich, Connecticut; Pacific is a California limited partnership with its principal place of business in San Diego,

California. The amount in controversy exceeds $75,000 exclusive of interest.

53. This Court has personal jurisdiction over both parties, all whom consented to such jurisdiction in the Agreement (PX 57 ¶ 6). Venue in this District is proper pursuant to the forum selection clause contained in the Agreement (PX 57 ¶ 6).

B. Choice of Law

54. The Agreement in issue in this matter provides for the application of New York state law (PX 57 ¶ 6). Because no party disputes the applicability of New York law here, I find that New York law governs plaintiff's claims in this matter.

C. Burden of Proof

55. Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence. E.g. Enercomp, Inc. v. McCorhill Pub., Inc., 873 F.2d 536, 542 (2d Cir. 1989); British Am. & Eastern Co. v. Wirth Ltd., 592 F.2d 75, 78 (2d Cir. 1979); EZ-Tixz, Inc. v. Hit-Tix, 969 F. Supp. 220, 225 (S.D.N.Y. 1997); Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 666 (S.D.N.Y. 1996), aff'd, 122 F.3d 1055 (2d Cir. 1997); New York State Elec. & Gas Corp., v. State, 218 A.D.2d 868, 870, 630 N.Y.S.2d 412, 414 (3rd Dep't 1995).

D. Interpretation of the Agreement

56. "Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of parties in entering the contract." Richard A. Lord, Williston on Contracts § 30.7 (2007).

57. Because Judge Batts has already ruled that the language of the Agreement is ambiguous, extrinsic evidence is admissible to determine the parties' intent as to the terms and meaning of the Agreement. See Curry Road Ltd. v. K-Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990); Sayers v. Rochester Tel. Corp. Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993).

58. Notwithstanding the materiality of extrinsic evidence in this case, "'[t]he best evidence of what parties to a written agreement intend is [still] what they say in their writing.'" Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 69 (2d Cir. 2005), quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565, 569 (2002); see also Seiden Assocs. v. ANC Holdings, 959 F.2d 425, 428 (2d Cir. 1992) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use"); Webb v.

GAF Corp., 936 F. Supp. 1109, 1116 (N.D.N.Y. 1996) ("The explicit language of the provision is the foremost consideration").

59. A contract must be interpreted as a whole, with regard to all of its provisions; provisions should not be selected and interpreted in isolation, without regard to other provisions of the contract which bear upon them. See Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect'"); Computer Sys. of Am., Inc. v. Unum Life Ins. Co., 975 F.2d 922, 925 (1st Cir. 1992) ("The intention of the parties must be gleaned from all corners of the document, rather than from sentences or clauses viewed in isolation." (internal quotation marks omitted)); Williams Press v. State of New York, 37 N.Y.2d 434, 440, 335 N.E.2d 299, 302, 373 N.Y.S.2d 72, 77 (1975) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole . . . . The meaning of a writing may be distorted where undue force is given to single words or phrases." (internal quotation marks omitted)); see also Browning-Ferris Indus. v. County of Monroe, 103 A.D.2d 1040, 1040, 478 N.Y.S.2d 428, 430 (4th Dep't 1984), aff'd, 64 N.Y.2d 1046, 479 N.E.2d 247, 489 N.Y.S.2d 902 (1985) ("a contract should be interpreted to give meaning and effect to every provision"); Tougher Heating &

Plumbing Co. v. State of New York, 73 A.D. 2d 732, 733, 423 N.Y.S.2d 289, 290-91 (3rd Dep't 1979) ("[I]t is a fundamental principle that the intention of the parties must be gleaned from all corners of the document . . rather than from sentences or clauses viewed in isolation; and every part of the contract should be interpreted to give effect to its general purpose[.]").

60. In construing the provisions of a contract, courts are to give due consideration "to the circumstances surrounding its execution, to the purpose of the parties in making the contract and, if possible, . . . give the agreement a fair and reasonable interpretation." In re Nat'l Basketball Ass'n, 630 F. Supp. 136, 140 (S.D.N.Y. 1986). See also Lubrication & Maint., Inc. v. Union Res. Co., 522 F. Supp. 1078, 1081 (S.D.N.Y. 1981) ("determination of the intent of the parties at the time they entered into the contract is governed by . . . what they wrote, their acts, conduct and all surrounding circumstances"); Pittsburgh Coke & Chem. Co. v. Boiler, 421 F. Supp. 908, 928 (E.D.N.Y. 1976), aff'd, 560 F.2d 1089 (2d Cir. 1977) (same).

61. In interpreting the provisions of the Agreement, the doctrine of contra proferentem has no applicability, because Mercury and Pacific both participated in the drafting of the Agreement over a period of eight months. See PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (rule that ambiguous language should be construed against the interest of the party

that drafted it applies only when the objecting parties "did not draft, edit or alter the Agreement; nor did they have the opportunity to influence the specific provision"); Record Club of Am. v. United Artists Records, 72 Civ. 5234 (WCC), 1991 WL 73838 at *7 (S.D.N.Y. Apr. 29, 1991) ("Although Record Club prepared the first draft, the Agreement was the result of successive drafts with UAR making many changes. UAR had equal and ample opportunity to clarify any ambiguity"); Irving Trust Co. v. Nationwide Leisure Corp., 711 F. Supp. 166, 168 (S.D.N.Y. 1989) (an ambiguous contract is to be construed against the drafter only if the other party "had no voice in the selection of its language").

E. Mercury's Obligations Under the Agreement

62. Paragraph 1 of the Agreement provided that Mercury was to assist Pacific "in analyzing, structuring, negotiating, effecting the Transaction(s)" (PX 57 ¶ 1).

63. Pacific's executives testified that Mercury's entitlement to fees for a transaction was conditioned on Mercury working on that specific transaction (Rush Aff. ¶¶ 16, 18; Toothacre Aff. ¶¶ 22, 23, 38; Rush Dep. (PX 94) at 132-33; Toothacre Dep. (PX 95) at 178-79, see also 124-25, 129-30).

64. Malcolm MacLean testified, however, that as Pacific's sole and exclusive financial advisor, Mercury was to be

entitled to advisory fees for any transactions that closed during the life of the Agreement and for 36 months afterward, regardless of whether Mercury specifically worked on those transactions or not (MacLean Aff. ¶¶ 15-17, 48-49; Tr. at 59).

65. Indeed, while Paragraph 2 of the Agreement provides that Mercury would receive "compensation for [its] services" (PX-57 ¶ 2), there is no explicit condition in the Agreement requiring Mercury to work on every specific transaction for which it receives an advisory fee. To the contrary, the language of the Agreement states that Mercury is Pacific's "sole and exclusive financial advisor" and that it is to be paid for "any placement of private or public equity" that closes (PX 57 at Introductory Paragraph, ¶ 2(a)).

66. "Conditions are not favored, and, in the absence of unambiguous language will not be found by the Court." Irving Trust Co. v. Nationwide Leisure Corp., supra, 711 F. Supp. at 168, quoting Uniroyal, Inc. v. Heller, 65 F.R.D. 83, 93 (S.D.N.Y. 1974).

67. Pacific argues that Mr. MacLean's reference to a "success fee" in his September 28, 2001 letter to Pacific reference (PX 82) corroborates Pacific's position that Mercury was to be paid only for transactions on which it specifically worked. This argument is unpersuasive, however, in light of Mr. MacLean's testimony that he used the term "success fee" to denote

success for Pacific at realizing a given financing transaction, regardless of whether Mercury generated or otherwise participated in that specific transaction (MacLean Aff. ¶ 74; PX 82 at 1; Tr. at 62).

68. Exclusive-financial-advisor contracts in which the advisor is entitled to fees on any transaction that close during a defined period of time regardless of whether the advisor participated in the transactions that closed during that period, have been upheld and enforced in this jurisdiction. See e.g. Chase Manhattan Bank v. Remington Prods., 865 F. Supp. 194, 199 (S.D.N.Y. 1994), aff'd, 71 F.3d 407 (2d Cir. 1995) (granting summary judgment to plaintiff financial-advisor under exclusive advisory contract for fees on transactions on which plaintiff did not work because plaintiff performed the services contracted for and the contract did "not even condition [plaintiff's] entitlement to a fee on its being involved in a consummated transaction"); see also Oscar Gruss & Son, Inc. v. Hollander, 98 Civ. 8744 (RMB), Doc. No. 34 (S.D.N.Y. Nov. 16, 2000) (granting summary judgment to plaintiff financial-advisor; plaintiff's advice and meetings with potential investors were sufficient to fulfill the contract and require defendant to compensate plaintiff even if a particular transaction did not close, because the contract did not specify any such condition).

69. Based on the demeanor of the witnesses at trial, and the absence of any language in the Agreement conditioning Mercury's fees on its performance of work on each specific transaction, I credit the testimony of Mr. MacLean on this issue and find that Mercury was not required to perform services on each specific transaction in order to be entitled to fees under the Agreement.

70. The only express exceptions in the Agreement are in Paragraphs 2(c) and (d), which limit Mercury's right to be compensated for (1) mortgage/property-related financings or (2) mergers, acquisitions or sales, to transactions originated by Mercury (PX 57 ¶ 2(c) and (d); Tr. at 132).

71. Dr. Rush's addition of these conditions to only Subparagraphs 2(c) and 2(d) implies that they are not applicable to any other provisions of Paragraph 2. Accordingly, I conclude that Mercury's right to compensation for other types of financings is not limited to transactions that Mercury originated. To hold otherwise would render the express conditions set forth in Subparagraphs 2(c) and 2(d) superfluous, a result which is disfavored under canons of contract construction. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995) ("a document should be read to give effect to all its provisions and to render them consistent with each other"); Galli v. Metz, supra, 973 F.2d at 149 ("Under New York

law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible"); Lawyers' Fund for Client Protection v. Bank Leumi, 94 N.Y.2d 398, 404, 727 N.E.2d 563, 567, 706 N.Y.S.2d 66, 70 (2000) (finding defendant's interpretation of contract "unsupportable" because it "would render the second paragraph superfluous").

F. Whether the Agreement Was Limited to a "Roll-Up" Transaction

72. Pacific offered testimonial evidence at trial that it engaged Mercury only for a larger, roll-up transaction involving the generation of a large amount of capital by rolling-up all of its properties into a single entity and that Mercury would earn a fee only if such a transaction occurred (Rosenthal Aff. ¶ 5; Toothacre Aff. ¶¶ 11, 29; Toothacre Dep. (PX 95) at 54, 91, 93-94, 179, 192, 199-200, 210-11; Tr. at 111, 126, 131, 147, 156-57, 159, 172; 235-36, 264-67; 269-71).

73. The language of the Agreement refers to multiple financing transactions but does not mention a "roll-up" transaction (PX 57 at Introductory Paragraph ("and/or", "capitalization strategies"), ¶ 1 ("the Transaction(s)"), ¶ 2 ("at closing of each Transaction"), ¶ 2(a) ("the Transaction(s)"), ¶ 2(b) ("the Transaction(s)"), ¶ 2(c) ("the Transaction(s)"), ¶ 2(d) ("the Transaction(s)"), ¶ 2(e) ("the

Transaction(s)"), ¶ 7 ("the transactions contemplated hereby"), ¶ 9 ("any Transaction that is completed within 36 months"); see also PX 57 (no use anywhere of the term "roll-up" or "larger transaction" or related term)).

74. The language of the Agreement also refers to the possibility of many transactions that would not be "roll-up" transactions, such as a placement of private or public equity, a merger, sale or acquisition, or an initial public offering (PX 57 ¶ 2(a), (d), and (e)).

75. Thus, the language of the Agreement strongly suggests that it was meant to apply to many different types of financing transactions, not merely to a single "roll-up" transaction. See Postlewaite v. McGraw-Hill, Inc., supra, 411 F.3d at 69; Williston on Contracts, supra, § 32.2.

76. Although Pacific argues the Agreement was limited to "roll-up" transactions, it was unable to cite any language in the Agreement which expressly limited its engagement with Mercury to such a larger transaction. Indeed, Dr. Rush admitted that the Agreement did not, by its express terms, limit Mercury's role to advising on a single "roll-up" transaction (Tr. at 264-65).

77. Dr. Rush, testified that Paragraph 2(a) of the Agreement could include a private placement of equity securities, but only for a larger transaction. Dr. Rush then conceded,

however, that the Agreement nowhere limits its terms to such a larger transactions (Tr. at 265-68).

78. Dr. Rush testified that the provision in Paragraph 2(a) of the September 28, 2001 draft of the Agreement entitling Mercury to a warrant to purchase 350,000 shares of common equity in Pacific evidenced the intention of the parties to limit the engagement to "larger" transactions. Dr. Rush admitted, however, that he deleted this provision from the draft (Tr. at 266-68).

79. Pacific offered contemporaneous documentary evidence that a larger, roll-up transaction had been contemplated by the parties as falling within the scope of the Agreement. For example, Pacific offered a January 2002 letter, drafted by Messrs. Rosenthal and MacLean and sent to Pacific's investors, which expressly referred to the Rothschild transaction as a "roll-up" and stated that Pacific had retained Mercury as an advisor for this transaction (DX N, PX 23).

80. Pacific also offered a November 2001 letter in which Mr. Toothacre described the Rothschild transaction as involving "each Affiliate [being] rolled up" (PX 26 at 2], and a February 2002 e-mail from Mr. MacLean discussing the "[t]he roll in of [certain] property" in connection with the Rothschild transaction (PX 45). This evidence does not corroborate Pacific's claim that Mercury was retained solely for a roll-up transaction, however, because while this evidence demonstrates

that the parties contemplated a roll-up transaction, it simply does not provide any indication that the scope of the Agreement was to be limited solely to such a transaction, especially in light of the fact that Paragraph 2 of the Agreement provides the rates at which Mercury was to be compensated for various types of non-roll-up transactions.

81. Pacific also argues that its claim that Mercury was retained solely for a larger roll-up transaction is corroborated by Mercury's bills. Specifically, Pacific argues that on the multiple occasions on which Mercury billed for its retainer fee and expenses (PX 51; PX 52; PX 53), it referred only to "Project LaJolla" and specifically identified the fee as a "[r]etainer for financial advisory services in connection with Convertible Debenture Placement" -- a reference to the roll-up transaction with Rothschild that the parties were then working on (PX 80 at 1 (the "Proposed Term Sheet for Private Placement" for the Rothschild roll-up, explaining that it involved such a convertible debenture: "The Debentures will be freely convertible")). This evidence could support an inference that the parties viewed the agreement as pertaining only to this larger transaction.

82. Also supportive of Pacific's position on this issue is the fact that it expressly rejected Mercury's request for a broader engagement. Mr. MacLean had proposed that Mercury

be hired to give "general business and financial analysis" (Cf. PX 86; Tr. at 69, 238). However, Dr. Rush rejected this language because it was "too general" (Tr. 238-39). As a result, the phrase was stricken from the Agreement [PX 82; PX 57; Tr. at 74, 239].

83. Pacific also argues that the circumstances under which the Agreement was executed confirm that Mercury was engaged solely for a roll-up transaction. Specifically, Pacific notes that the Agreement was not finalized and executed until late December 2001 or early January 2002, when, in light of the execution of the December 2001 Amendment to the Rothschild transaction Term Sheet (PX 81), it appeared that the roll-up transaction was actually going to occur (Rush Aff. ¶¶ 22-25). I find this argument unpersuasive, however, in light of Dr. Rush's internally inconsistent testimony on the subject of whether Pacific intentionally deferred signing the Agreement (Compare Tr. 195: "I just wanted to look at what the rollup would look like before we signed the definitive agreement," and Rush Aff. ¶ 17: "[W]e deferred making any definitive arrangement until Mercury could produce a satisfactory roll-up transaction," with Tr. 194: "We didn't intentionally delay it," and Tr. at 195: "I didn't consciously delay it"). In light of these inconsistencies, I find that the circumstances under which the Agreement was executed do not corroborate Pacific's position here.

84. The Agreement does not refer to or even use the term "Rothschild." [MacLean Aff. ¶¶ 65-66; PX 57; Tr. at 120). An earlier draft of the Agreement included a reference to Rothschild suggested by Mr. Toothacre, but this reference was stricken (MacLean Aff. ¶¶ 65-66; PX 57 ¶ 2; PX 82 ¶ 2; PX 86 ¶ 2; Tr. at 119-20).

85. Mr. MacLean testified that he repeatedly told Pacific that the Agreement would apply to different types of financing transactions and that no one from Pacific ever expressed any disagreement with this idea (MacLean Aff. ¶¶ 49, 78, 87-88, 94, 97, 123-24). Mr. MacLean further testified that no one from Pacific ever communicated to anyone from Mercury during the negotiation of the Agreement that it would apply only to a single "roll-up" transaction (MacLean Aff. ¶¶ 57, 87-88, 100, 104, 124).

86. Mr. Toothacre conceded at trial that he never sent a letter, e-mail or any other written communication to Mercury indicating that Pacific was only hiring Mercury for a "roll-up" transaction (Tr. at 116-17).

87. On balance, I find that the weight of the documentary evidence supports the conclusion that the Agreement was not intended by the parties to be limited to a single roll-up transaction. Furthermore, in light of the demeanor of the witnesses while testifying at trial, I find that the testimony of

Pacific's executives that the Agreement was intended to be limited to solely a larger, roll-up transaction is not credible, and credit contrary testimony by Mr. MacLean that the Agreement was not so limited.

G. Meaning of "Property-Related Financing"

88. Under New York law, "the courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous." John Doris, Inc. v. Solomon R. Guggenheim Found., 209 A.D.2d 380, 381, 618 N.Y.S.2d 99, 100 (2d Dep't 1994). In "the absence of fraud or other overreaching," it is not the "court's function to rewrite improvident or inequitable provisions of a contract." In re Nat'l Basketball Ass'n, supra, 630 F. Supp. at 140. Indeed, a court cannot revise or modify an agreement simply because the defendant realizes, "with the benefit of hindsight, [that it] may have made a bad bargain." Lease Corp. of Am., Inc. v. Resnick, 288 A.D.2d 533, 535, 732 N.Y.S.2d 266, 269 (3rd Dep't 2001).

89. It is the parties' "intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour." New England Merch. Nat'l Bank v. Iran Power Gen. & Transmission Co., 502 F. Supp.

120, 127 (S.D.N.Y. 1980), abrogated on other grounds, 646 F.2d 779 (2d Cir. 1981).

89. In evaluating the intentions of the parties at the time the contract was executed, "it is the objective intent of the parties that controls." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997). Indeed, "the subjective but unexpressed intentions of the parties [can not] be considered." Baum v. Rockland Cmty. Coll., 299 F. Supp.2d 172, 175 n.1 (S.D.N.Y. 2003); see also Sally v. Sally, 225 A.D.2d 816, 818, 638 N.Y.S.2d 832, 834 (3rd Dep't 1996).

90. The language of the Agreement supports the conclusion that "property-related financing" refers to a subset of mortgage financing, and not to Pacific's traditional individual-project financings. Paragraph 2 of the Agreement sets forth different categories of financings -- equity, debt, mortgage instruments, mergers/sales/acquisitions, and an initial public offering and sets forth the fee payable for each. The harmony of this catalogue is disrupted if most of the sub-paragraphs describe types of financing, whereas one part of Paragraph 2(c) is read differently to describe Pacific's historical practice of financing that actually involves several different types of financing.

91. Reading Paragraph 2 in a manner that gives effect to all of its terms and harmonizes those terms, "property-related

financing" is most reasonably interpreted to mean a type of financing, specifically, mortgage-like debt instruments secured by an interest in real property. Reda v. Eastman Kodak Co., 233 A.D.2d 914, 914-15, 649 N.Y.S.2d 555, 557 (4th Dep't 1996) ("[T]he court should give effect to the intent of the parties as revealed by the language and structure of the contract and should ascertain such intent by examining the document as a whole. Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms." (internal citations omitted)).

92. The extrinsic, contemporaneous evidence concerning this clause of the Agreement also supports the conclusion that "property-related financing" refers only to a subset of mortgage financing, and not to Pacific's traditional project-by-project financing transactions. In a September 29, 2001 cover letter accompanying the draft engagement letter of the same date, Mr. MacLean described sub-paragraph (c) as "clarif[ying] the fee structure for mortgage debt versus senior, subordinated or mezzanine debt;" this language clearly suggests that MacLean was differentiating a particular type of debt -- mortgages -- from the other types of debt set forth in Paragraph 2(b), and he does not even mention "property-related financing," which appears from this context to be merely a subset of mortgage financing (PX 82 at 1).

93. Mr. MacLean's testimony that he added Paragraph 2(c) -- creating a separate category for mortgages with a lower advisory fee (1% as opposed to 2%) -- to address Pacific Medical's reluctance to pay Mercury a fee for any mortgage transactions that closed, was consistent with this cover letter (MacLean Aff. ¶¶ 80-81; PX 82 at 1).

94. Also consistent with this cover letter is MacLean's testimony that he added the phrase "property-related financing" to refer to any mortgage-like debt instrument secured by an interest in real property (MacLean Aff. ¶ 82; Tr. at 115; 133).

95. Examples of property-related financing include construction loans, which are temporary debt instruments secured by an interest in real property that cover the financing of construction on the property (MacLean Aff. ¶ 82; see also Rush Dep. (PX 94) at 29; Tr. at 183-84), and deeds of trust, which are temporary debt instruments, secured by an interest in a building, used until a permanent mortgage is secured (MacLean Aff. ¶ 82; see also Rush Dep. (PX 94) at 48; Tr. at 227).

96. Pacific offered the testimony of its executives in support of its contention that "property-related financing" was a term it regularly used to refer to its traditional project-by-project financing, (Powell Dep. (PX-97) at 23; Rosenthal Aff. ¶¶ 6-7; Rush Aff. ¶¶ 3-5, 24-26; Rush Dep. (PX 94) at 130, 133;

Toothacre Dep. (PX 95) at 179, 186; Toothacre Aff. ¶¶ 3, 4; Tr. 100-101; 109-110; 232) and that the phrase "property-related financing" was added to the agreement to address and deal separately with Pacific's insistence, expressed to Mr. MacLean, that it not have to pay Mercury a fee on the type of transactions Pacific traditionally did, and to take such transactions out of the purview of ¶¶ 2(a) and (b) (Powell Aff. ¶ 8; Powell Dep. (PX 97) at 23; Rush Aff. ¶¶ 3, 4; Rush Dep. (PX 94) at 20, 130, 133; Toothacre Aff. ¶ 25, see also ¶¶ 3, 4; Toothacre Dep. (PX 95) at 179, 186; Tr. at 105-06, 111-12, 114, 126-27, 154-55; 264).

97. Pacific did not, however, produce any written correspondence to either directly demonstrate or support an inference that it ever communicated its proffered interpretation of the term "property-related financing" to Mr. MacLean.

98. Additionally, Pacific did not present persuasive documentary evidence to corroborate the testimony of its executives that "property-related financing" was a term it used in its regular course of business to refer to its traditional project-by-project property financing transactions. The documentary evidence adduced at trial by Pacific in support of this contention -- the Term Sheet which Pacific Medical and Rothschild signed in August 2001 -- used the terms "individual real property transactions" and "property transactions," but nowhere referred to these transactions as "property related

financings" (PX-26 at 7). Similarly, the December 2001 Amendment to the Term Sheet referred to Pacific's individual transactions, including the Hillsboro, Reno and Burbank transactions, as "Pipeline Properties," but, again, did not use the term "property-related financing" (PX 81 at 1).

99. The evidence also demonstrated that Pacific did not use the phrase "property-related financing" anywhere in its corporate literature to describe its method of raising money, but instead described its financing methods as the raising of equity and the securing of debt (MacLean Aff. ¶¶ 10-11, 84; PX 2 at MP 00138-45; Tr. at 216).

100. In light of the demeanor of Pacific's witnesses at trial, and Pacific's failure to provide corroborating documentary evidence, I do not credit the testimony of Pacific's executives that their proffered interpretation of the term "property-related financing" was communicated to Mr. MacLean, nor do I credit their testimony concerning Pacific's alleged prior use of the term property-related financing.

H. Termination of the Agreement

101. Paragraph 9 of the Agreement unambiguously requires a party to provide 30-day written notice of termination if it intends to terminate the Agreement (MacLean Aff. ¶ 163; PX 57 ¶ 9; Tr. at 171).

102. Pacific admittedly did not provide written notice of termination until February 7, 2003 (MacLean Aff. ¶¶ 161-63; PX 50 at p. 2; PX 57 ¶ 9; Tr. at 171).

103. Pacific claims that the Agreement terminated on April 22, 2002, upon the termination of the proposed Rothschild transaction, and that Mercury was given verbal notice to this effect (Rush Aff. ¶ 30; Rush Dep. (PX 94) at 141-42; Toothacre Aff. ¶ 39; Toothacre Dep. (PX 95) at 91, 154-56, 207). Pacific argues that the parties understood that the termination of negotiations with Rothschild ended Mercury's engagement under the Agreement (Rush Dep. (PX 94) at 141-42; Toothacre Dep. (PX 95) at 156), and that this understanding is corroborated by the fact that Mercury ceased performing services for Pacific after Rothschild terminated its negotiations with Pacific (Toothacre Aff. ¶ 40; Tr. at 93-94).

104. The manner in which parties to a contract conduct themselves can evidence their understanding and the intent of their agreement. See Old Colony Trust Co. v. Omaha, 230 U.S. 100, 118 (1913) ("The practical interpretation of a contract by the parties . . . before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); Ocean Transp. Line v. Am. Phil. Fiber Indus., 743 F. 2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the

parties' intent"; Gestetner Holdings v. Nashua Corp., 784 F. Supp. 78, 83 (S.D.N.Y. 1992)(same).

105. Here, however, Mercury's conduct does not support a finding that it agreed to terminate the contract without the written notice required by the Agreement. To the contrary, the evidence shows that Mercury was prepared to continue performance under the Agreement once it received the retention fee owed under the Agreement, but that Pacific refused to work with Mercury, refused to pay the money that it owed, did not request any further services of Mercury (MacLean Aff. ¶ 141, 159, 163; PX 16; Tr. at 93, 169-70, 222).

106. Pacific's position concerning the date of termination is baseless and directly contradicted by the express terms of the Agreement. Accordingly, I find that the Agreement was formally terminated on March 9, 2003 -- thirty days after Pacific provided written notice of termination in accordance with Paragraph 9 of the Agreement (PX 57 ¶ 9).

I. Thirty-Six Month Post-Termination Period

107. As discussed above, Paragraph 9 of the Agreement provided that Mercury was entitled to fees on "any Transaction that [was] completed within 36 months of the expiration or termination of th[e] Agreement" (PX 57 ¶ 9).

108. Because the Agreement was terminated on March 9, 2003, the thirty-six month post-termination period in which Mercury is entitled to fees extends until March 9, 2006.

J. <u>Pacific's Liability to Mercury</u>

109. In light of the foregoing, I conclude that Pacific is obligated to pay financial advisory fees to Mercury for any transactions that closed during the period beginning upon the execution of the Agreement and ending on March 9, 2006, to the extent those transactions involved equity, senior, subordinated or mezzanine debt, a merger, acquisition or sale, or an initial public offering (PX 57 ¶ 2(a), (b), (d), (e), ¶ 9).

110. There have been at least three financing transactions by Pacific Medical that involved the raising of equity prior to March 9, 2006, including the Hillsboro, Burbank, and Reno transactions (PX 6; PX 7; Toothacre Dep. (PX 95) at 23, 26, 28-29; Tr. at 224-25). Mercury is entitled to advisory fees on the equity component of these financing transactions.

111. Mercury is also entitled to advisory fees on any other financing transactions which may have closed during the contractual period involving equity, senior, subordinated or mezzanine debt, or an initial public offering.

112. Pursuant to Paragraph 2(c) of the Agreement, however, Mercury is not entitled to any fees on any mortgage or

property-related financing -- meaning mortgage-like debt financing secured by an interest in the property -- associated with these transactions, because Mercury did not originate these or any other transactions.

K. Attorney's Fees

113. It is unclear whether the parties' December 1, 2006 settlement of the expenses claims in this action (Declaration of Samuel E. Bonderoff, Esq., dated January 10, 2007, ¶ 3), included plaintiff's claims for attorney's fees in connection with this action (Joint Pre-Trial Order at 3).

114. To the extent that it did not, Mercury's claim for attorney's fees is unavailing.

115. Attorney's fees for litigation are not recoverable unless expressly and explicitly provided for in the agreement of the parties. Oscar Gruss & Son v. Hollander, 337 F. 3d 186, 199 (2d Cir. 2003); Hooper v. AGS Computers, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905, 549 N.Y.S.2d 365, 367 (1989) ("a promise by one party to a contract to indemnify the other for attorneys' fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees").

116. Agreements for attorney's fees "must be strictly construed to avoid inferring duties that the parties did not

intend to create". Oscar Gruss & Son v. Hollander, supra, 337 F. 3d at 199. Thus, "the court should not infer a party's intention to waive the benefit of the rule [barring recovery of attorneys' fees] unless the intention to do so is unmistakably clear from the language of the promise". Hooper v. AGS Computers, supra, 74 N.Y.2d at 492, 548 N.E.2d at 905, 549 N.Y.S.2d at 367; see also Eastman Kodak Co. v. STWB Inc., 232 F. Supp. 2d 74, 95 (S.D.N.Y. 2002).

117. The provision in the Agreement relating to legal fees and disbursement provides that Pacific "will reimburse Mercury Partners for its reasonable expenses, including the fees and disbursements of its legal counsel, incurred in connection with this engagement" (PX-57 ¶ 2 at end).

118. This provision clearly applies to the transactional fees incurred in connection with Mercury's performance of services under the Agreement, not legal expenses for lawsuits regarding the meaning and obligations of the parties under the Agreement.

119. Consistent with this conclusion, the attorneys' fee provision is contained in the paragraph providing for reimbursement of expenses "incurred in connection with this engagement" (PX-57 ¶ 2 final section), not in the provisions relating to legal actions or indemnification (cf. PX-57 ¶¶ 5, 6,

7). The attorney's fee provision does not refer to attorneys' fees in connection with a lawsuit to enforce the agreement.

120. Under these circumstances, there is no basis on which to award Mercury the attorney's fees it incurred in this action. See e.g. Oscar Gruss & Son v. Hollander, supra, 337 F.3d at 199-200 (denying attorneys' fees where contract provided that attorneys' fees were "includ[ed] without limitation in connection with the enforcement of this Agreement," because the clause did not expressly refer to an action between the contracting parties themselves"); Tracetebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 03 Civ. 6731 (HB), 2006 WL 147586 (S.D.N.Y. Jan. 20, 2006) (denying attorneys' fees where contract provided for award of attorney's fees "in connection with termination" of the agreement because the clause did not specifically provide for such fees in connection with litigation to enforce the agreement); Carr v. First Fed. Sav. & Loan, 132 A.D.2d 513, 514, 517 N.Y.S.2d 256, 258 (2nd Dep't 1987) (no attorneys' fees for litigation where contract in issue provided for fees for other situations but not litigation).

121. Accordingly, Mercury is not entitled to attorney's fees or the costs and disbursements incurred in connection with this action.

IV. Conclusion

Accordingly, for all the foregoing reasons, I find Mercury is entitled to advisory fees for the Hillsboro, Reno, and Burbank transactions, to the extent those transactions involved equity, senior, subordinated or mezzanine debt, or an initial public offering.

I further find that Mercury is entitled to a declaratory judgment that it is entitled to advisory fees on any other transactions which closed during the period beginning upon the execution of the Agreement and ending on March 9, 2006, to the extent such transactions involved equity, senior, subordinated or mezzanine debt, or an initial public offering.

I also express my gratitude to counsel for both sides for the excellence of their presentations of a factually complex case and for their consistently professional conduct. The care and attention to detail that went into both sides' oral presentations and written submissions was obvious and was greatly appreciated.

Counsel shall report to Courtroom 18A on August 16, 2007 at 4:00 p.m. to set a schedule for the trial of the damages issue.

Dated: New York, New York
July 30, 2007

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Martin I. Kaminsky, Esq.
Justin Y.K. Chu, Esq.
Pollack & Kaminsky
114 West 47th Street
New York, New York 10036

David A. Fleissig, Esq.
Samuel Bonderoff, Esq.
The Dontzin Law Firm LLP
6 East 81st Street
New York, New York 10028